Aspen Specialty Ins. Co. v. Nucor Corp., 2022 NCBC 69.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

ASPEN SPECIALTY INSURANCE
COMPANY; ENDURANCE AMERICAN
SPECIALTY INSURANCE COMPANY;
PARTNERRE IRELAND INSURANCE
LTD.; HELVETIA SWISS INSURANCE
COMPANY; LEXINGTON INSURANCE
COMPANY; LIBERTY MUTUAL FIRE
INSURANCE COMPANY; LIBERTY
SURPLUS LINES INSURANCE
COMPANY; XL INSURANCE AMERICA,
INC.; ZURICH AMERICAN
INSURANCE COMPANY; and ACE
AMERICAN INSURANCE COMPANY,

             Plaintiffs,

    v.

NUCOR CORPORATION; and NUCOR
STEEL LOUISIANA, LLC,

             Defendants,

    and

XL INSURANCE AMERICA, INC.; and
LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

             Intervening Complaint-
             Plaintiffs,

    v.

NUCOR CORPORATION; and NUCOR
STEEL LOUISIANA, LLC,

             Intervening Complaint-
             Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 19887

**ORDER AND OPINION ON**

**NUCOR CORPORATION AND
NUCOR STEEL LOUISIANA, LLC'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT AGAINST XL
INSURANCE AMERICA, INC.**

**AND**

**NUCOR CORPORATION AND
NUCOR STEEL LOUISIANA, LLC'S
MOTION FOR LEAVE TO AMEND
COUNTERCLAIMS AGAINST
INTERVENING-COMPLAINT
PLAINTIFFS**

**[PUBLIC]**

1. THIS MATTER is before the Court upon Defendants/Intervening Complaint-Defendants Nucor Corporation and Nucor Steel Louisiana, LLC's (collectively, "Nucor") Motion for Partial Summary Judgment Against XL Insurance America, Inc. ("XL"), ("Nucor's Motion for Partial Summary Judgment") (ECF No. 155), and Nucor's Motion for Leave to Amend Their Counterclaims Against Intervening-Complaint Plaintiffs, ("Nucor's Motion to Amend") (ECF No. 181). For the reasons stated below, Nucor's Motion for Partial Summary Judgment is **DENIED** and Nucor's Motion to Amend is **GRANTED** in part and **DENIED** in part.[1]

> *Hedrick Gardner Kincheloe & Garofalo LLP, by David L. Levy and C. Rob Wilson; and Hinshaw & Culbertson LLP, by David E. Heiss and Peter E. Kanaris, for Plaintiffs Aspen Specialty Insurance Company, Endurance American Specialty Insurance Company, Partnerre Ireland Insurance Ltd., Helvetia Swiss Insurance Company, Lexington Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Surplus Lines Insurance Company, XL Insurance America, Inc., Zurich American Insurance Company, and Ace American Insurance Company.*
>
> *Moore & Van Allen PLLC, by Jonathan D. Gilmartin and Scott M. Tyler; and Flanagan Partners LLP, by Harold J. Flanagan, Meghan F. Grant, Alice L. Duplechain, Thomas M. Flanagan, and Camille E. Gauthier, for Defendants/Intervening Complaint-Defendants Nucor Corporation and Nucor Steel Louisiana, LLC.*
>
> *Johnston, Allison & Hord, P.A., by Kimberly J. Kirk and Kathleen D.B. Burchette; and DLA Piper LLP (US), by Robert C. Santoro, Aidan M. McCormack, and Benjamin Shuman, for Intervening Complaint-Plaintiffs XL Insurance America, Inc. and Liberty Mutual Fire Insurance Company.*

---

[1] Because certain materials referenced in this Order and Opinion were filed under seal with the Court, the Court's ruling was provisionally filed under seal on 2 November 2022. The Court then permitted counsel for the parties to confer and advise the Court whether they contend any matters referenced herein require redaction. The parties did not propose any redactions. Accordingly, the Court now files the unredacted, public version of this Order and Opinion.

Earp, Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact on motions for summary judgment. The summary below is intended as background for the Court's decision. *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142 (1975).

3. This case arises from an industrial incident ("Incident") that occurred at Nucor's Convent, Louisiana facility in November 2017. (Compl. ¶ 1, ECF No. 3.) The facility processes iron ore into "direct reduced" iron ("DRI" or "sponge iron") that is then shipped to another facility for use in the production of steel. (Compl. ¶¶ 17, 22.)

4. In order to produce sponge iron, marble-sized pieces of iron ore are transported on three conveyors equipped with a weight belt feeder encoder. (Compl. ¶ 18.) The ore must first be coated with cement before entering a reactor and heated to drive off the oxygen contained in the ore and convert it to DRI. Iron ore that enters the reactor without the protective cement coating solidifies and cannot be used in steel manufacturing. (Compl. ¶ 20.)

5. On 7 November 2017, personnel at the Convent facility observed that an encoder, the device that monitors the speed of the conveyor belt and the weight of the ore, did not appear to be functioning correctly. (Compl. ¶¶ 19, 23.) The suspect encoder was replaced with one taken from an idle conveyor in the Convent facility. (Compl. ¶ 24.) However, sometime after the suspect encoder was changed and the line was restarted, Nucor personnel became aware that the iron ore entering the reactor had not been coated with cement. As a result, approximately two thousand four

hundred (2,400) metric tons of uncoated ore solidified, forming clusters in the reactor. (Compl. ¶¶ 26–27.) Nucor incurred losses with respect to the ruined ore, the business interruption, and other costs sustained in the course of removing the reactor from service and repairing it. (Nucor's Ans. Affm. Defs. Int. Pls.' Compl. & Counterclms. ¶¶ 18–21, ECF No. 26.)

6.      Plaintiffs in this case are ten property insurers[2] (the "Property Insurers") that contracted with Nucor to insure its property. Intervening Plaintiffs are two insurers, XL and Liberty Mutual Fire Insurance Company ("Liberty Mutual"; together, "the EB Insurers"), that contracted to insure Nucor for risks related to equipment breakdown. Both the Property Insurers and the EB Insurers assert a claim for declaratory judgment, asking the Court to determine if there is coverage under their respective policies for the losses incurred by Nucor. (*See* ECF Nos. 3, 6.) Nucor, in turn, counterclaims for declaratory relief and breach of contract. (*See* ECF Nos. 25, 26.)

7.      On 24 May 2021, the Court entered an Order on Fourth Joint Motion to Modify Case Management Order (the "CMO"). The CMO divided the discovery period for fact discovery into two parts: the first for written fact discovery, and a second period for fact depositions. (*See* ECF No. 104.) After receiving an extension, the

---

[2] Aspen Specialty Insurance Company, Endurance American Specialty Insurance Company, Partnerre Ireland Insurance Ltd., Helvetia Swiss Insurance Company, Lexington Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Surplus Lines Insurance Company, XL Insurance America, Inc., Zurich American Insurance Company, and Ace American Insurance Company.

parties have now completed written fact discovery,[3] and they are engaged in fact depositions. Pursuant to the CMO, the deadline for the ultimate completion of fact discovery is 3 February 2023. (*See* ECF No. 144.)

8. In accordance with Rule 30(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)"), on 13 April 2022, Nucor conducted the deposition of Aaron Divine ("Divine"), XL's representative. Based on Divine's testimony, Nucor moves for partial summary judgment to establish that certain provisions of XL's policy, as well as certain allegations in the EB Insurers' Intervening Complaint (the "Design Allegations"),[4] cannot be used by XL as the basis for its denial of Nucor's claim.

9. In addition, Nucor's discovery efforts, including both the deposition of Divine and the 11 May 2022 deposition of David Lofton (the EB Insurers' investigator), have led it to move to amend its counterclaims against the EB Insurers.

10. Accordingly, on 11 July 2022, the Nucor Motion to Amend was filed, seeking to assert a new cause of action for unfair and deceptive trade practices pursuant to N.C.G.S. § 75-1.1 *et seq.* ("UDTPA"). Nucor also requests that it be permitted to withdraw an allegation that it no longer wishes to assert (regarding System Installation and Soft Costs coverage) and to update the damages and losses that it claims.

---

[3] The parties reserved the right to propound discrete written discovery requests or supplement productions if prompted by information developed in depositions.

[4] The EB Insurers included in their Intervening Complaint allegations that the Incident was not caused by a "Breakdown" in "Covered Equipment," but rather was caused by the faulty design of Nucor's DCS, the computerized system that controls its production line. (Intervening Complaint ¶¶ 19–20 [the "Design Allegations"], ECF No. 6.)

## II. LEGAL STANDARD

11. "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018) (quoting N.C. R. Civ. P. 56(c)). "[A] genuine issue is one which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (internal quotation marks omitted).

12. On a motion for summary judgment, "[t]he evidence must be considered 'in a light most favorable to the non-moving party.'" *McCutchen v. McCutchen*, 360 N.C. 280, 286 (2006) (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470 (2004)). "[T]he party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985).

13. A movant may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citations omitted). Thus, the moving party "assumes

the burden of positively and clearly showing there is no genuine issue as to any material fact and he or she is entitled to judgment as a matter of law." *Lewis v. Blackman*, 116 N.C. App. 414, 417 (1994).

14. "If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Lowe v. Bradford*, 305 N.C. 366, 369–70 (1982) (quoting N.C. R. Civ. P. 56(e)) (emphasis omitted). If the nonmoving party does not satisfy its burden, then "summary judgment, if appropriate, shall be entered against [the nonmovant]." *United Cmty. Bank (Ga.) v. Wolfe*, 369 N.C. 555, 558 (2017) (quoting N.C.R. Civ. P. 56(e)).

15. With respect to Nucor's Motion to Amend, there is no more liberal canon in the Rules than that leave to amend "shall be freely given when justice so requires[,]" *Vaughan v. Mashburn*, 371 N.C. 428, 434 (2018) (quoting N.C.R. Civ. P. 15(a)), although "the right to amend pursuant to Rule 15 is not unfettered." *Howard v. IOMAXIS, LLC*, 2021 NCBC LEXIS 116, at \*17 (N.C. Super Ct. Dec. 22, 2021). "Reasons justifying denial of an amendment include: (1) undue delay, (2) bad faith, (3) undue prejudice, (4) futility of amendment, and (5) repeated failure to cure defects by previous amendments." *Window World of St. Louis, Inc. v. Window World, Inc.*, 2015 NCBC LEXIS 79, at \*\*18 (N.C. Super. Ct. Aug. 10, 2015) (citing *Martin v. Hare*, 78 N.C. App. 358, 361 (1985)).

16. "Ultimately, whether to allow an amendment rests in the trial judge's discretion." *KRG New Hill Place, LLC v. Springs Inv'rs, LLC*, 2015 NCBC LEXIS 20,

at *8 (N.C. Super. Ct. Feb. 27, 2015) (citing *House of Raeford Farms, Inc. v. Raeford*, 104 N.C. App. 280, 282 (1991)).

## III. ANALYSIS

### A. Nucor's Motion for Partial Summary Judgment

17. Summary judgment is an extreme remedy and should be awarded only where the truth is quite clear. *Lee v. Shor*, 10 N.C. App. 231, 233 (1970). Clearing the hurdle for summary judgment can be difficult to accomplish on a complete record, much less one where the parties are still in the throes of discovery. *See Conover v. Newton*, 297 N.C. 506, 512 (1979) ("Ordinarily it is error for a court to hear and rule on a motion for summary judgment when discovery procedures, which might lead to the production of evidence relevant to the motion, are still pending and the party seeking discovery has not been dilatory in doing so."); *Ussery v. Taylor*, 156 N.C. App. 684 (2003) (where one party did not have adequate time to develop its case before summary judgment was heard, summary judgment was improper).

18. The question at the center of this motion is whether the testimony of XL's Rule 30(b)(6) deponent, Divine, contains admissions that establish as a matter of law that: (a) certain policy provisions cited by XL in support of its denial of Nucor's insurance claim, discussed below, as well as (b) Design Allegations included in XL's Intervening Complaint, cannot be the basis for XL's denial of Nucor's insurance claim. In short, Nucor requests that the Court enter partial summary judgment holding that Divine's testimony forecloses application of the referenced policy provisions and Design Allegations.

19. Nucor specifically argues that Divine admitted, on behalf of XL, that there is no "faulty design" exclusion in XL's policy. Therefore, the argument goes, the Design Allegations (that the Incident was not caused by the encoder, but instead was caused by the faulty design of Nucor's digital communication system ("DCS")), have no application to XL's coverage determination. (Br. Supp. Nucor's Mot. Partial Sum. Judg. 6–8 ["Nucor's Br. Supp. SJ"], ECF No. 156.) In addition, Nucor argues that Divine admitted that certain aspects of the definition of "Breakdown" in XL's Equipment Breakdown policy have no application to this case. (Nucor's Br. Supp. SJ 8–9.)

20. XL responds that Nucor's motion is premature because fact discovery with respect to the cause of the Incident is ongoing, and expert designations and reports have yet to be exchanged. (XL's Mem. Opp. Mot. Partial Sum. Judg. 3–5 ["XL's Mem. Opp. SJ"], ECF No. 172.) It also argues that determining the meaning of language in an insurance contract is a question of law for the Court, not a question of fact for Divine. XL's position is that Nucor is asking the Court to rule on "cherry-picked" contract language stripped of its context and to issue declarations without the benefit of a full record. (XL's Mem. Opp. SJ 5.)

21. Specifically, XL contends that Divine's testimony that there is no faulty design exclusion in its policy is not an admission that XL did not consider a possible fault in the design of the DCS as the cause of the Incident. And, although XL agrees that a faulty design *exclusion* was not the basis for its coverage determination, it maintains that such a theory supports its conclusion, which was that denial of the

claim was appropriate because no "Breakdown" in "Covered Equipment" occurred. Instead, XL alleges, the cause of the loss was a defectively designed automated control system and human error. (XL's Mem. Opp. SJ 9–10.)

22. As for Divine's testimony that some subparts of the definition of "Breakdown" were not used in its coverage determination, XL explains that Divine was testifying regarding what was known about the Incident at the time the coverage determination was made. It contends that Divine testified only that the subparts were not considered then, not that they could never be applicable. XL points to the fact that it reserved the right to supplement its position in the Declination Letter and, in any event, it argues that the doctrine of waiver is not available to create coverage where it does not exist. (XL's Mem. Opp. SJ 5–16.)

23. In evaluating Nucor's motion, the Court starts with the language of the policy, which defines "Breakdown" both by what it is and what it is not. According to the policy:

> **Breakdown**
> Means the following direct physical loss that causes damage to "Covered Equipment" and necessitates its repair or replacement:
>
> 1. Failure of pressure or vacuum equipment;
>
> 2. Mechanical failure including rupture or bursting caused by centrifugal force; or
>
> 3. Electrical failure including arcing,
>
> unless such loss or damage is otherwise excluded within this coverage form.
>
> **"Breakdown" does NOT mean** or include any of the following ["Not a Breakdown"]:

a. Malfunction including but not limited to adjustment, alignment, calibration, cleaning, or modification [the "Malfunction Exclusion Modification Endorsement"][5];

b. Defects, erasures, errors, limitations or viruses in computer equipment and programs including the inability to recognize and process any date or time or provide instructions to "Covered Equipment." However, if a "Breakdown" to "Covered Equipment" ensues, we will pay the ensuing loss or damage not otherwise excluded.

c. Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

d. The functioning of any safety or protective device; or

e. The cracking of any part on an internal combustion gas turbine exposed to the products of combustion.

(Nucor's Br. Supp. SJ, Ex. A, Ex. 5 ("Policy") (emphasis added).)

24. These definitions are included in XL's letter denying the claim, which concluded:

Our investigation determined that the Encoder did not sustain direct physical loss that causes damage to 'Covered Equipment' and necessitates repair or replacement. The Encoder was tested and proved operational in accordance with manufacturer's specification. The solidification event that took place in the DRI Vessel was not the result of a 'Breakdown' to 'Covered Equipment.'

(Nucor's Br. Supp. SJ, Ex A, Ex. 23 ("Declination Letter"), ECF No. 164).

25. The Declination Letter closes with two paragraphs in which the EB Insurers reserve the right to supplement their decision:

XL Insurance America, Inc., and Liberty Mutual Insurance reserves its [sic] right to supplement this statement or its position with additional

---

[5] The Malfunction Exclusion Modification Endorsement is itself modified by an endorsement to add, "however, if a 'Breakdown' to 'Covered Equipment' ensues, we will pay the ensuing loss or damage not otherwise excluded." (Nucor's Br. Supp. SJ, Ex. A, Ex. 5., ECF No. 161.)

grounds for reserving its rights and defending coverage under the referenced policy should any such grounds appear hereafter. This is not intended to be nor should be construed as a waiver of any terms or conditions of the policy or XL Insurance America, Inc. and Liberty Mutual Insurance rights thereunder all of which continue in full force and effect.

Please be advised that nothing contained herein is intended to constitute or should be construed as a waiver or relinquishment of any legal or equitable rights or remedies of XL Insurance America, Inc., its parents, subsidiaries, and affiliates, all of which are hereby expressly reserved. This communication is made without prejudice and may not be construed as a waiver, estoppel or modification of any of the terms, conditions, limitations or exclusions of the applicable insurance contract or by operation of law.

(Declination Letter 5.)

26. In addition to the information included in the Declination Letter regarding the denial of the claim, the EB Insurers included the Design Allegations in their Intervening Complaint. They aver that the Incident was not caused by a "Breakdown" in "Covered Equipment," but instead was caused by the faulty design of Nucor's DCS, the computerized system that controlled its production line. (Intervening Complaint ¶¶ 19–20.)

27. During XL's Rule 30(b)(6) deposition, Divine was first asked about the Design Allegations. He testified:

Faulty design was not the basis for the denial. The basis for the denial of the claim was the fact that the encoder was tested and determined that there was no breakdown. It functioned as designed. Beyond that, some sort of issue going on here–so logic, I guess, would make you think that potentially its designed software. I know that there were software changes that were made. But that doesn't change the fact that the encoder did not suffer a breakdown . . . . No breakdown, no coverage.

(Nucor's Br. Support SJ, Ex. A. ("Divine Dep.") 187:2–11; 188:13.)

28.    Divine then acknowledged that XL's policy does not contain a design exclusion:

> There is not a fault design exclusion. The policy provides for a breakdown.  So it has to be a breakdown as per the definition of policy.  No breakdown, no coverage.

(Divine Dep. 203:2–5.)  After testifying that it appeared that Count II of the Property Insurers' Complaint referenced a faulty design exclusion in the Property Insurers' policy, (Divine Dep. 190:24–191:4), Divine agreed that XL was required to interpret only its own policy when making its coverage decision, not the Property Insurers' policy.  (Divine Dep. 192:12–13.)

29.    Divine was then questioned about the definition of "Breakdown" in its policy:

> Q.  Okay. And is faulty design relevant to the question of whether there's a breakdown?
>
> A.  Faulty design is not included within the definition of breakdown.
>
> Q.  What about an error in design?
>
> A.  Error in design is not either.
>
> Q.  Okay. So is the question the issue of a faulty design or an error in design consequential in the analysis of this claim to the EB policy terms?
>
> A.  No.  The critical piece is whether or not a breakdown has occurred.

(Divine Dep. 204:12–22.)

30.    Nucor argues that, by virtue of this testimony, XL has admitted that it cannot rely on the Design Allegations in this case because it has no faulty design exclusion in its policy.  After reviewing Divine's testimony in its entirety, the Court disagrees.

31. In most cases, a party's statements, given in a deposition or at trial of the case, are treated as evidential admissions rather than as judicial admissions. *Woods v. Smith*, 297 N.C. 363, 373–74 (1979). Thus, a party's adverse testimony is treated "like the testimony of any other witness called by the party, that is, the party is free (as far as any rule of law is concerned) to elicit contradictory testimony from the witness himself or to call other witnesses to contradict him." *Id.* (quoting *McCormick on Evidence* § 266, p. 637 (2d ed. 1972)). In contrast, a judicial admission is "a formal concession made by a party (usually through counsel) in the course of litigation for the purpose of withdrawing a particular fact from the realm of dispute. . . . Such an admission is not evidence, but rather removes the admitted fact from the field of evidence by formally conceding its existence. It is binding in every sense." *Id.* (quoting 2 *Stansbury's North Carolina Evidence*, § 166, pp. 1–4 (Brandis Rev. 1973)).

32. To constitute a binding judicial admission, the statement by a party opponent must be deliberate and unequivocal, and the party should manifest an intent to be bound by stating it with a clear understanding of the consequences. *Woods*, 297 N.C. at 370.

33. In conducting its review of Divine's statements, the Court looks at the testimony as a whole. *Jones v. Durham Anesthesia Assocs., P.A.,* 185 N.C. App. 504, 510 (2007). When a party equivocates, expresses uncertainty, or is inconsistent, the testimony does not constitute a binding admission. *Compare Cogdill v. Scates*, 290 N.C. 31, 43 (1976) (finding judicial admission where plaintiff testified to "concrete facts, not matters of opinion, estimate, appearance, inference or uncertain memory,"

and her testimony was "deliberate, unequivocal and repeated. It left no room for the hypothesis of mistake or slip of the tongue") *with Jones* 185 N.C. App. at 510 (the defendant's testimony, when viewed as a whole, does not show that she gave unequivocal, adverse testimony sufficient to constitute a judicial admission).

34.    After reviewing Divine's deposition in its entirety, the Court agrees that Divine testified that there is no specific design defect exclusion in XL's policy. However, he repeatedly stated that the basis for denying coverage was that no "Breakdown" in "Covered Equipment" occurred, referring to the suspect encoder, which was tested and determined to be performing in accordance with specifications. He stated that based on the facts gathered,

> there was potentially design and/or software type issue within the system.  The testing didn't identify a breakdown, but *that's the next logical place to look*.  If there was a software change, then potentially some sort of design issues.

(Divine Dep. 203:16–20 (emphasis added).)   Thus, Divine does not rule out the possibility that a problem of some type in the DCS caused the loss.  (*See* Divine Dep. 171:8–174:15.)

35.    Nucor argues that XL admitted that the Design Allegations were not consequential; however, the word "consequential" was introduced by Nucor's counsel in his question ("So is the question the issue of a faulty design or an error in design consequential in the analysis of this claim to the EB policy terms?"), not by the witness in his answer.  And Divine's answer, ("No. The critical piece is whether or not a breakdown occurred."), placed emphasis on the definition of a "Breakdown" but  did not foreclose the possibility that the problem was in the design of the DCS.  This is not

the type of certain, unequivocal testimony rising to the level of a judicial admission as was contemplated in *Cogdill.* In short, the Court cannot conclude that Divine's testimony on this point is sufficiently deliberate to constitute a binding judicial admission warranting an award of partial summary judgment.

36. Nucor next contends that Divine admitted through his deposition testimony that subsections (b)–(e) of the "Not a Breakdown" portion of the "Breakdown" definition were included in the Declination Letter only to "provide the policyholder with the full and complete policy language" and were not the basis of XL's denial of Nucor's claim. (Nucor's Br. Supp. SJ 9 (quoting Divine Dep. 221:18–23).)

37. XL protests that Nucor has mischaracterized Divine's testimony. According to XL, Divine did not testify that subsections (b)–(e) could never apply under any circumstances; rather, he testified that XL was not *aware,* at the time, that the subsections were applied to reach the conclusion that no "Breakdown" had occurred because the encoder was functioning properly.

38. Again, after a thorough review of Divine's testimony, the Court finds that the statements isolated by Nucor do not rise to the level of an admission that would prevent application of subsections (b)–(e) to a coverage determination. During the 30(b)(6) deposition, Divine was told to refer to the Declination Letter, dated 2 July 2018, and then asked why subsections (b)–(e) were cited. He responded that the intent was to include the complete definition of "Breakdown" (including the definition of what was "Not a Breakdown"), and that he was "*not aware* of B through E being applicable,

given the fact that the testing showed there was no issue with the encoder." (Divine Dep. 222:1–3 (emphasis added).)

39. The Court agrees that this testimony does not constitute an unequivocal statement that the subsections at issue could never apply. This is particularly true given XL's language reserving the right to supplement its position should grounds to do so appear.[6] And, although Divine was designated to testify to XL's thought process when the Declination Letter was drafted, ultimately the interpretation of the insurance contract is a matter of law for this Court to decide. *See e.g., Accardi v. Hartford Underwriters Ins. Co.*, 373 N.C. 292, 295 (2020) ("[D]etermining the meaning of language in an insurance policy presents a question of law for the Court.").

40. In short, considering Divine's testimony in the light most favorable to XL, the Court determines that it does not establish as a matter of law that either the Design Allegations or subsections (b)–(e) of the "Not a Breakdown" definition in the policy are inapplicable to a coverage determination. Accordingly, Nucor's Motion for Partial Summary Judgment is DENIED.

B. Nucor's Motion to Amend

41. Through the depositions of Divine and David Lofton, a principal in Boiler Machinery Loss Adjusting Services, LLC ("BMLAS"), the firm with which the EB Insurers contracted to investigate the claim, Nucor asserts that it has discovered

---

[6] At the hearing, counsel for Nucor agreed that the waiver doctrine would not permit Divine, through his testimony, to create coverage for a risk that was not otherwise covered by the terms of the policy. *See* Transcript ("Tr.") 8; *see also U.S. Fid & Guar. Co v. Country Club of Johnston Cnty., Inc.*, 119 N.C. App. 365, 373 (1995); *Pearce v. Am. Defender Life Ins. Co.*, 316 N.C. 461, 466 (1986); *Durham v. Cox*, 65 N.C. App 739, 744 (1984).

evidence of wrongful conduct in the EB Insurers' claims handling. This discovery has led Nucor to move to amend its counterclaims against the EB Insurers to assert a violation of the UDTPA.[7]

42.    Nucor alleges that Lofton's testimony establishes that, at the time of the coverage determination, the EB Insurers were aware that not one, but two "incidents" had occurred that could have led to coverage: (i) the suspect encoder might have been operating improperly; and (ii) after replacing the encoder, the DCS controlling the line reverted to manual mode and instructed the system to reset the cement setting to zero. (Br. Supp. Nucor's Mot. Amend Counterclms. 12 ["Nucor Br. Supp. Mot. Amend"], ECF No. 182.) Although the EB Insurers investigated the first of the two —the operation of the encoder—they did not investigate what happened with the DCS even though Lofton drew attention to it. Had they investigated the DCS, Nucor argues, another provision in the policy, the Electronic Circuitry Impairment Endorsement ("ECI endorsement"), might have provided coverage. (Lofton Dep. 47:22–48:19.) Instead, Nucor argues, the EB Insurers briefly referenced the Malfunction Exclusion Modification Endorsement in the policy without further discussion and concluded that, because the encoder was functioning, no "Breakdown" in "Covered Equipment" had occurred. (Nucor Br. Supp. Mot. Amend 12.)

---

[7] Nucor also moves to withdraw its allegations regarding System Installation and Soft Costs coverage and to update the amount of its damages. (Nucor Mot. Amend. 2, ECF No. 181.) The EB Insurers have not objected. Accordingly, as to these two proposed amendments, the Motion to Amend is **GRANTED** as uncontested.

43.     Nucor further contends that the EB Insurers purposely focused their investigation on the encoder, and not the DCS, because of the possibility of subrogation from the encoder's manufacturer. (Nucor Br. Supp. Mot. Amend 12.)

44.     Finally, Nucor asserts that the EB Insurers cited to the wrong policy language when they denied the claim. Nucor explains that not only did the EB Insurers fail to address the possible application of the ECI endorsement, but they also referenced inapplicable subsections of the "Not a Breakdown" definition. According to Nucor, these facts evidence violations of the Unfair Claim Settlement Practices section of the North Carolina Insurance Code, N.C.G.S. § 58-63-15(11) and support a UDTPA cause of action. (Nucor Br. Supp. Mot. Amend 13.)

45.     The EB Insurers oppose the addition of a UDTPA claim, contending that it comes too late, would be prejudicial, and, in any event, is futile. (EB Ins. Mem. Opp. Mot. Amend Counterclms. 5–24 ["EB Ins. Mem. Opp. Mot. Amend"], ECF No. 188.)

46.     First, the EB Insurers argue that the facts Nucor claims to have only recently discovered have been known by Nucor for years. The Declination Letter, dated July 2018, describes the investigation that was conducted without mention of the DCS system. Therefore, the EB Insurers argue, Nucor was aware when it received the Declination Letter that no investigation of the DCS system was done.

47.     In further support of their argument, the EB Insurers point to a civil action Nucor filed in November 2019 against the EB Insurers in a Louisiana state court. (*See* Complaint, ["Louisiana Action"], ECF No. 188.1.)[8] Nucor's Complaint in the Louisiana

---

[8] The Court takes judicial notice of Nucor's complaint in *Nucor Corporation and Nucor Steel Louisiana LLC v. XL Insurance America, Inc. and Liberty Mutual Fire Insurance Company,*

Action alleges, "[t]he reactor . . . sustained damage . . . resulting from the electrical failure or electric circuitry impairment . . . of the feeder system." It further alleges that "[t]he July 2, 2018 denial mistakenly focused on the original encoder." (Louisiana Action, ¶ ¶ 37, 43.) Thus, the EB Insurers argue, in November 2019 Nucor was both aware that the EB Insurers did not investigate the DCS and believed that the Incident was caused by an electrical failure because Nucor included those allegations in the Louisiana action.

48. Finally, the EB Insurers argue that they identified the DCS system as the potential source of the problem (albeit described as faulty design) in their Intervening Complaint filed more than two years ago. Even if Nucor had not discovered it before then, the EB Insurers argue, Nucor's theory that the ECI endorsement covered the Incident but was never investigated should have been apparent at least by the time the Intervening Complaint was filed. (EB Ins. Mem. Opp. Mot. Amend 6–14.)

49. With respect to Nucor's argument regarding the EB Insurers' investigation of possible subrogation, the EB Insurers respond that there is nothing new here, either. They point to multiple communications produced in discovery referencing their claim investigation and documenting Nucor's objection to use of the same engineer to explore possible subrogation. Again, the EB Insurers argue, the communications prove that Nucor knew all of this years ago. (EB Ins. Mem. Opp. Mot. Amend 12.)

---

No. 39615, 23rd Judicial District, Parish of St. James, Louisiana. (EB Ins. Mem. Opp. Mot. Amend Ex. A, ECF No 188.) *See Herrera v. Charlotte Sch. of Law, LLC*, 2018 NCBC LEXIS 35, at *21 (N.C. Super Ct. Apr. 20, 2018) ("[W]hen a party requests that the Court take judicial notice of a fact and supplies the Court with the necessary information, the Court is required to take judicial notice of the fact if it satisfies Rule 201(b)."). *See also* N.C.G.S. § 8C-1, Rule 201(d).

50. As for failure to cite to the ECI endorsement in the Declination Letter, the EB Insurers argue that Nucor has been aware of this fact since it received the Declination Letter in July 2018. They argue that they did not cite the ECI endorsement because, at the time, no one, including Nucor, believed that it applied. The EB Insurers' theory, as stated in their Intervening Complaint, was that a design flaw in the DCS caused it to reset to manual mode. (*See* Design Allegations.) Again, the EB Insurers argue, the recent depositions conducted by Nucor revealed nothing that was not already known and that would justify an amendment after years of litigation.

51. The Court acknowledges the EB Insurers' argument that Nucor's proposed amendment comes late in the game. When considering whether to disallow an amendment because of undue delay, the Court focuses on the moving party's reason for not bringing the claim earlier. *See e.g., Rabon v Hopkins*, 208 N.C. App. 351, 354 (2010) ("[A] trial court may appropriately deny a motion for leave to amend on the basis of undue delay where . . . the record or party offers no explanation for the delay."); *Columbus Life Ins. Co. v. Wells Fargo Bank, N.A.*, 2022 NCBC LEXIS 40, at **11 (N.C. Super. Ct. May 3, 2022) (Defendant's decision to wait until it had obtained relevant documents in discovery before asserting counterclaim for fraud did not amount to undue delay).

52. Here, Nucor does not contest that it received and read the Declination Letter, which does not mention an investigation of the DCS, and that it knew, at least by the time the EB Insurers filed their Intervening Complaint in March 2020, that the EB

Insurers were aware that the DCS was implicated. In addition, it is clear that by the time Nucor filed the Louisiana Action in November 2019, Nucor itself thought that the problem with the DCS was in the electrical circuitry. Where Nucor says its knowledge was lacking, and what it did not discern until the Lofton deposition in May 2022, was that the EB Insurers focused on the encoder and did not conduct an investigation of the DCS *even after* Lofton, the "general" in charge of the investigation (Lofton Dep. 63:10–11), directed their attention to the possibility of a problem in the DCS. Nucor contends that Lofton's testimony revealed, among other things, that the EB Insurers were so intent on the possibility of subrogation with respect to the encoder that they limited their investigation despite his comments. It was the recent discovery of this information, Nucor says, that brought the EB Insurers' motivation into focus.

53. As for undue prejudice, the EB Insurers argue, without detail, that allowing a UDTPA claim at this juncture would change the nature of its defense and increase the stakes of the lawsuit. Although "[d]ocument discovery is nearly complete, and depositions are well underway[,]" (EB Ins. Mem. Opp. Mot. Amend 24), the EB Insurers believe the addition of the UDTPA claim would give rise to the need for additional discovery. Nucor, on the other hand, states that if the claim were permitted it would not request additional written discovery and would proceed with depositions, as planned. (Nucor Br. Supp. Mot. Amend 17.)

54. When determining whether undue prejudice will result, the burden of proof is on the EB Insurers to establish that they would be prejudiced. *Mauney v. Morris*, 316 N.C. 67 (1986); *North River Ins. Co. v. Young*, 117 N.C. App. 663, 671 (1995).

55. On this point, the EB Insurers' argument is thin. The fact that significant discovery has occurred is not determinative, particularly given that the CMO affords the parties another three months to complete fact discovery.[9] While the proposed claim undoubtedly changes the nature of the case, the EB Insurers have not presented a sufficient showing of prejudice to overcome Rule 15's requirement that leave to amend be freely given when justice so requires. *See e.g., N. River Ins. Co.*, 117 N.C. App. at 671 ("Nor does the fact that additional discovery may be required amount to prejudice or make the delay 'undue.'").[10]

56. Which brings the Court to the EB Insurers' argument on futility. Nucor alleges that its UDTPA claim is premised on alleged unfair claim settlement practices as defined in N.C.G.S. § 58-63-15(11). It contends that the EB Insurers engaged in:

    a. Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

* * *

    d. Refusing to pay claims without conducting a reasonable investigation based upon all available information; and

* * *

---

[9] At the hearing, counsel for the EB Insurers projected that three depositions might need to be reopened and additional documents sought. (Tr. 72–73.)

[10] At the hearing, counsel for the EB Insurers added that they would be prejudiced by the proposed amendment because technical changes made by Nucor in the interim to prevent a recurrence of the problem also prevent the EB Insurers from unearthing the truth about the role of the DCS in the Incident. (Tr. 53–54.) But it appears that at least some of these changes occurred within days of the Incident, not years later. (*See e.g.,* XL's Mem. Opp. SJ Ex. B, ECF No. 172.2.) Without specific evidence, the Court cannot conclude that the EB Insurers' defense has been prejudiced by the passage of time.

n. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

N.C.G.S. § 58-63-15(11)(a), (d), (n).

57. With respect to subsection (a), the misrepresentation basis for the UDTPA claim, the EB Insurers argue that the proposed amendment is futile because it does not allege either that Nucor relied on a misrepresentation or that it was damaged as a result. Without these necessary allegations, the EB Insurers contend, this part of the proposed claim fails.

58. Nucor responds, reiterating the alleged misrepresentations and highlighting paragraph 67 of the proposed amendment, which states that Nucor suffered damages as a result of the EB Insurers' allegedly unfair or deceptive acts. Nucor does not, however, address the EB Insurers' argument that the element of reliance has not been pleaded. (Nucor Reply Br. Supp. Mot. Amend Counterclms. 6–7 ["Nucor Reply Br."], ECF No. 194.)

59. On this point, the Court agrees with the EB Insurers. A claim under the UDTPA based on misrepresentation requires the pleader to allege: (1) actual reliance and (2) that the reliance was reasonable. *Bumpers v. Community Bank of Northern Virginia,* 367 N.C. 81, 90 (2013) (the UDTPA requires that "the plaintiff . . . affirmatively incorporated the alleged misrepresentation into [the plaintiff's] decision-making process[.]"); *D C Custom Freight, LLC v. Tammy A. Ross & Assocs.,* 273 N.C. App. 220, 231 (2020) (in order to succeed on a UDTP claim arising under Section 58-63-15(1), a plaintiff must show reliance on the misrepresentation). Because these

elements are missing from Nucor's attempted *per se* UDTPA claim based on N.C.G.S. § 58-63-15(11)(a), that part of the claim is futile.

60.  As for subsection (d), refusal to pay the claim without conducting a reasonable investigation into the DCS, the EB Insurers argue that the proposed claim does not allege that their investigation was unreasonable based on the facts known at the time. In addition, they argue that the allegations advanced against them are too conclusory to allow the claim to move forward. (EB Ins. Mem. Opp. Mot. Amend 18–19.)

61.  Nucor responds that the case law cited by the EB Insurers is inapposite because it either: (a) involved a merits-based review of the reasonableness of an investigation on a motion for summary judgment, *Christmas v. Nationwide Mut. Ins. Co.,* 30 F. Supp. 3d 435 (E.D.N.C. 2014), or (b) the facts alleged revealed that at least some investigation was performed, *Essential Ins. Co. v. Stephens*, 530 F. Supp. 3d 582 (E.D.N.C. 2021). In the present case, on the other hand, Nucor contends that the EB Insurers did not conduct an investigation of the DCS at all, despite recognizing that alternative "incidents" had occurred and being urged by its investigator to do so. (Proposed Am. Compl. ¶ 28, ECF No. 182.5.)

62.  Here, the Court agrees with Nucor. The facts alleged are sufficient to give rise to a claim that the EB Insurers failed to conduct a reasonable investigation based on all available information prior to denying the claim. The Court therefore determines that Nucor's allegations with respect to N.C.G.S. § 58-63-15(11)(d) may proceed.

63. Addressing subsection (n) and Nucor's contention that the EB Insurers failed to promptly provide a reasonable explanation of the basis in their policy for the denial of the claim, the EB Insurers point to their 6-page Declination Letter, which they assert "detailed the investigation, the results from the encoder testing, and the conclusions of the EB Insurers' expert." (EB Ins. Br. 20.) The letter, they argue, "was more than enough to provide a reasonable explanation of the basis of the denial," and the mere fact that Nucor disagrees with the EB Insurers does not constitute an unfair claim settlement practice. (EB Ins. Mem. Opp. Mot. Amend 20.)

64. Nucor responds that the EB Insurers' 6-page Declination Letter only addressed the encoder without addressing the DCS. In addition, they argue that while each bad act alleged alone could support a UDTPA claim, the totality of the conduct alleged also sufficiently states a claim. Finally, Nucor contends that although a violation of practices enumerated in N.C.G.S. § 58-63-15(11) is a *per se* violation of the UDTPA, a violation of that statute is not required to maintain a UDTPA claim. Nucor asserts that its allegations generally establish that the EB Insurers' handling of its claim was unfair or deceptive, that the conduct was in or affecting commerce, and that the conduct proximately caused Nucor injury. (Nucor Reply Br. 8–9.)[11]

---

[11] The EB Insurers also assert that the proposed claim fails because Nucor does not allege that it suffered damages caused by the EB Insurers' allegedly unfair and deceptive practices. Instead, they say, the allegations are limited to "standard breach of contract losses for which coverage was denied." (EB Ins. Mem. Opp. Mot. Amend 21.) The Court concludes that Nucor's allegation that it suffered damages, "including the losses for which coverage was denied and losses associated with Nucor personnel's downtime and unabsorbed overhead, attorneys' fees, and court costs, as well as any other damages or equitable relief the facts and equity may warrant," is sufficient at this stage. *See Coley v. Champion Home Builders Co.,* 162 N.C. App. 163, 165 (2004).

65. Again, given the liberal construction of pleadings required by Rule 15, the Court agrees that the allegations are sufficient to state a claim. *See e.g., Murray v. Nationwide Mut. Ins. Co.,* 123 N.C. App 1, 10 (1996) ("Violation of any form of conduct listed in [N.C.G.S.] § 58-63-15(11) operates as a *per se* instance of unfair and deceptive trade practice under [N.C.G.S.} § 75-1.1."); *Country Club of Johnston Cnty., Inc. v. United States Fid. & Guar. Co.,* 150 N.C. App. 231, 245 (2002) (North Carolina courts have held that "we may look to the types of conduct prohibited by [N.C.G.S.] § 58-63-15(11) for examples of conduct which would constitute an unfair and deceptive act or practice."). Whether the claim will survive a merits-based review—a point hotly contested by the parties during the hearing—is not yet before the Court.

66. Finally, the Court addresses the EB Insurers' argument that the proposed UDTPA claim does not survive the four-year statute of limitations. The EB insurers cite *State Farm Fire & Cas. Co. v. Darsie*, 161 N.C. App 542, 545 (2003), for the proposition that, in order for the proposed amendment to relate back, the original pleading must have given them sufficient notice of the proposed claim. They deny having had notice that they would be accused of any unfair and deceptive conduct. (EB Ins. Mem. Opp. Mot. Amend 22–23.)

67. "A claim asserted in an amended pleading is deemed to have been interposed at the time the claim in the original pleading was interposed, unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading." N.C.G.S. 1A-1, N.C. R. Civ. P. 15(c). Thus, the question here is whether the EB Insurers had notice of the

transactions and occurrences giving rise to the claim, even if they did not anticipate the claim itself. *See e.g., Estate of Tallman v. City of Gastonia,* 200 N.C. App. 13, 18 (2009) (relation back depends on "whether the original pleading gives notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading." (citation and internal quotation marks omitted)); *Concrete Serv. Corp. v. Invs. Grp.*, 79 N.C. App. 678, 683–84 (1986) (holding that the complaint gave defendant ample notice of the transactions at issue and the amendment merely added another legal theory of liability on the same facts).

68. There is no question that the proposed claim, like the ones before it, emanates from the EB Insurers' investigation and decision to deny Nucor's insurance claim resulting from the Incident. The difference now is that the EB Insurers' handling of the claim is also at issue. The Court determines that the EB Insurers had sufficient notice of the transactions and occurrences giving rise to the proposed claim for it to "relate back" to the initial filing of Nucor's other claims regarding the same events. Thus, the statute of limitations does not render the proposed amendment futile.

## IV. CONCLUSION

69. In sum, the Court, in its discretion, and after considering the relevant pleadings and matters of record, ORDERS as follows:

   a. Nucor's Motion for Partial Summary Judgment against XL Insurance America, Inc. is **DENIED**;

b. Nucor's Motion for Leave to Amend Counterclaims against Intervening-Complaint Plaintiffs is **GRANTED,** except that its motion as to N.C.G.S. § 58-63-15(ii)(a) is **DENIED** with prejudice.[12]

c. Nucor is directed to file its amended pleading in accordance with this Order within ten (10) days.

IT IS SO ORDERED, this the 8th day of November, 2022.

/s/ Julianna Theall Earp
_____
Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases

---

[12] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]" *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013). Here, the Court determines, in its discretion, that given the age of this case, permitting additional motion practice to amend the pleadings would unduly slow determination on the merits with little, if any, appreciable benefit.